FAHEY v. DETROIT UNITED RAILWAY.

COMPROMISE AND SETTLEMENT — INCOMPETENCY—WEIGHT OF EVIDENCE—RATIFICATION.

In an action for personal injuries, the entry of a judgment for defendant notwithstanding the verdict, based on a stipulation of the parties, is sustained by the weight of evidence as to plaintiff's competency to execute a release, and her subsequent ratification of the compromise by expending the money and failing to tender it back when in her right mind.

Error to Wayne; Brooke, J.  Submitted December 13, 1909.  (Docket No. 73.)  Decided April 1, 1910.

Case by Sarah J. Fahey against the Detroit United Railway for personal injuries.  A judgment for defendant *non obstante veredicto* is reviewed by plaintiff on writ of error.  Affirmed.

*Washington I. Robinson* and *Henry C. L. Forler,* for plaintiff.

*Brennan, Donnelly & Van De Mark,* for defendant.

McALVAY, J.   On September 2, 1902, plaintiff, who was a seamstress and on her way to her work at the residence of Mr. Jones at Grosse Pointe, was riding on the line of defendant company along Jefferson avenue in the city of Detroit.   A slight collision occurred at Bates street crossing, where there is a switch connecting the line on Jefferson avenue with that on Bates, caused by the front end of the car on which plaintiff was riding, going east, striking the rear platform of a large sight-seeing parlor car, which projected over the curve of the switch track. Both cars were moving slowly and but little damage was done to them.   Some glass was broken in the Jefferson avenue car, and a man was cut upon the hand by falling glass.   The conductor's attention was called to plaintiff by a man to whom she had complained.   She complained of a pain in her arm.   The conductor took her name and address.   She continued her journey about four miles, to the corner of Belvidere and Jefferson, getting off from the car at Dr. Bennett's office.   In charge of this office at this time was Dr. Marcus Hagan.   She told him she had been injured in a street car collision, and complained of her arm and side, and of feeling faint.   Dr. Hagan treated her, and went to the car with her, when she took it a short time after, for Grosse Pointe where she remained about 10 days doing sewing at the house of Mr. Jones.   She then came back to the city to No. 1503 Twenty-Third street, staying there a few days, and then called on Dr. Bird on Greenwood avenue.   On the same day, September 15th, she went to the claim department of defendant at No. 12 Woodward avenue.   On September 18th she telephoned for Dr. Hagan.   He found her in bed.   She complained to him of pain and nervousness.   He continued to treat her as her physician from that date until February 13, 1903, during which time he saw her profes-

sionally every day.  On many days he made two visits, and on several days three visits, to see her.  After September 18th Dr. Hagan next saw her on September 24th, when she came to his office in a carriage alone, and took him with her to Harper Hospital and entered as a patient. After plaintiff's visit to the claim department, as above stated, Dr. Brodie, defendant's surgeon, went to see her twice, and suggested that she go to the hospital.  She remained at Harper Hospital until January 6, 1903.  She was then taken to the Red Cross Hospital, and from there, on January 11th, to Grace Hospital, where she remained until February 23d.

Before she went to the hospital, and after she had called at defendant's claim department, Mr. Schneider of that department called on her to investigate relative to her claim and talked over the matter of her injury.  She promised to come to the office on the next day.  She came on the second day after, and asked what defendant was going to do for her.  At her request by letter he called again at Twenty-Third street when she complained of the poor care she was getting.  He next saw her at the hospital on October 7th, in answer to a telephone call from her, when she desired him to take her things away from 1503 Twenty-Third street and put them in storage, which he refused to do.  Afterwards plaintiff wrote three letters to Mr. Schneider and one to Mr. Ross, the claim agent, all referring to her condition, and those to Schneider asked him to come to the hospital to see her; the last one stating that she would like to talk business with him.  Schneider went to see her each time she sent for him.  The matter of settlement was discussed on October 23d, at the visit in answer to the last letter above mentioned.  He visited her several times after that, and on November 3d Mr. Schneider again saw her, when a settlement was again discussed, and also on November 5th, when he told her defendant would give her $400 and all the hospital bills, which she said she could not accept until she had seen Dr. Hagan.  He called again on November 8th, when she

told him that she was satisfied with the amount. She would not sign any papers unless Dr. Hagan was present. On November 10th, Mr. Schneider telephoned Dr. Hagan that he was going with a release voucher to plaintiff at the hospital and that she requested him to be present. Mr. Webber went with Schneider. At the hospital a settlement was made. Dr. Hagan was present. Four hundred dollars in a check was paid plaintiff and hospital bills to the amount of $102.86, in consideration of which she signed a release in full for all claims and causes of action, liability, etc., by reason of injuries received at the time of the accident. Schneider, Webber, and Dr. Hagan signed as witnesses.

On the same day plaintiff indorsed the $400 check in presence of Dr. Hagan, and requested him to deposit it in the People's Savings Bank as a commercial account. That bank refused to receive so small a commercial account, and he took it to the Home Savings Bank and deposited it. At the request of the bank he took a signature card to her, which she signed, and he returned it to the bank. The plaintiff's account was opened on that date in the savings department, with a credit of $400, and on her signed receipt $100 was drawn out which Dr. Hagan received. From that date down to April, 1907, the time of the trial of the case, amounts were drawn out from time to time upon her signed receipts therefor, and a balance of $15 remained to her credit. Her signatures to the above-mentioned papers and receipts are admitted to be genuine, and also that all withdrawals from this account after February 28, 1903, were made by her. She testifies that she never knew where this money came from; that she has no knowledge that she ever executed any release to defendant or that any settlement was ever had. The settlement of November 10th, above related, included all hospital bills in full to November 23, 1902.

On December 10th following she wrote a letter to Mr. Hutchins, president of defendant company, which is given in full, and reads as follows:

"HARPER HOSPITAL,
"Detroit,
"Dec. 10, 1902.

"Mr. J. C. HUTCHINS,
"Pres. United Str. Ry.,
"Detroit.

"*Dear Sir:*  As you are fully informed regarding the accident which occurred on September 13, 1902, between car 812 and Yolanda, which has been the cause of injuries sustained by me, causing much suffering and confinement, at the above hospital. The same for which purpose this message is written you needs no further, or detailed explanation. As I have underestimated the time which would be necessary for my recovery and as I will be indebted to the hospital for about one and one half or two weeks charges incurred on account of the injuries received in the accident, I write to say, that as I was cut off from my employment and it being my only resource for maintenance, I will here ask, are you disposed to settle this small amount with the hospital authorities. I sincerely trust that looking over the matter and considering what I have suffered for almost five months, as well as my losses, employment, patronage, etc., you will be honorable and see that this debt is canceled agreeable to all. You cannot fail to comprehend even in my sufferings that I was overly disposed to not impose, or even demand what to others would seem justice. I trust you will give it your personal and immediate attention. I am not asking anything unjust. But as I have been rendered helpless through the accident, the hospital indebtedness being unavoidable, it will have to be settled. I only ask justice. And I am sure you will acquiesce with me, that when I tell you truthfully, that as I step out of the hospital, almost destitute as the result of this unfortunate accident, that there is very little hope for a person as weak as I to face a dreary winter to begin over. I do not want to have recourse to any trouble in this matter and I hope you are so disposed. Of course the matter put in the hands of an attorney would be still more expensive and for the most part disagreeable. Trusting that you will treat this matter justly and asking your kindness to reply at your earliest convenience.

"Thanking you, I am,
"Very respectfully,
[Signed]          "SARAH J. FAHEY.

"P. S.   By calling the hospital by 'phone' or concurring with them you will be justly informed regarding my health.   Dr. Chapman of the staff I am sure would be pleased to tell you.

"Resp. S. J. F."

Mr. Hutchins replied as follows:

"Detroit United Railway,
        "12 Woodward Ave.
        "Detroit, Michigan,
                        "Dec. 16, 1902.
"Miss Sarah J. Fahey,
        "Harper Hospital,
                "Detroit, Michigan.
"*Dear Madam:*   Yours of the 10th was referred to our claim department.   I find that we hold your receipt in full of all claims arising out of your accident including a receipt for your hospital bill amounting to $102.86.   Our records show that you have been fully compensated.
                "Yours truly,
        [Signed]            "J. E. Hutchins, President."

On the same day she wrote the foregoing letter to Mr. Hutchins she wrote one of equal length relative to the same matter to Mr. Schneider asking him to call, and saying:

"As you no doubt know that I overestimated my strength and miscalculated the time I would be able to leave the hospital, and as there is a small amount due for the time it was necessary I should remain here with regard to the injuries I sustained in the United Railway accident with which you are familiar, I wish to ask that the company please be agreeable and adjust the same.   I wrote to Mr. Hutchins regarding it, but it is very hard for me as I feel to fully explain.   I trust you will do so for me."

Plaintiff, while admitting that these letters are in her handwriting, testifies that she has no recollection of having written them.   She remembers receiving the letter from Mr. Hutchins in answer to her letter of December 10th, and produced it on the trial.   The claim on the part of the plaintiff is that her mental condition was such that

she was not competent to make a settlement. All the evidence in the case was directed to that proposition.

At the close of the testimony defendant's counsel moved the court for a directed verdict. This motion was denied, and the case was submitted to the jury under the charge of the court. A verdict was returned in favor of plaintiff, and, in accordance with a stipulation between counsel theretofore made, upon motion made by defendant, the verdict was set aside, and a judgment was entered *non obstante veredicto.* Error is assigned upon such action of the court. The court granted defendant's motion on the ground that the verdict of the jury was against the weight of evidence in the case.

That a settlement was made in good faith by defendant with plaintiff, for a consideration of $400 paid to her and $102 paid in full for hospital charges, appears from this record to be established beyond question, as also does the fact that plaintiff received the $400, and on November 10th signed a full release and satisfaction for all claims for injuries received. To determine whether her claim that she had no knowledge of this settlement by reason of her mental and physical condition at the time, and was incompetent to enter into it, or has not by her acts and conduct since that time ratified it, is sustained by sufficient evidence to warrant the verdict which the court set aside, will require a most careful consideration of the testimony in that regard presented by this record, and a consideration of all the testimony bearing upon the history and credibility of the plaintiff.

The settlement was brought about at her solicitation. The record contains many of her letters to that effect, which, as well as all the other letters written by her both before and after the settlement, indicate a clear understanding of the subject-matter treated, which is expressed in language unusually good for the average person and devoid of incoherency. Attention is called to the letter written Mr. Hutchins on December 10, 1902, which she remembers and admits was partly written by her. This

letter, read in connection with this settlement, is conclusive that at the time it was written the fact that a settlement had been made was in the mind of the writer, and that the intention was to convince Mr. Hutchins that a payment of the additional amount asked would be preferable to a suit for damages broadly hinted at. There does not appear to be the slightest confusion of the details of the accident, including the number and names of the cars in collision on the date mentioned. The letter to Mr. Schneider, written by plaintiff on the same day, is of the same general character, and contains references which clearly indicate a knowledge of the settlement. Dr. Hagan who was her physician from the date of the accident was present at the settlement. He had visited her daily from the time she entered the hospital. His testimony is emphatic that at the time this settlement was made she was competent. The other witnesses present testify to the same effect. We do not find anything in this record to warrant the suggestion that Dr. Hagan was in any way connected with the defendant company or interested in its behalf, or indicating that his conduct of plaintiff's case was not skillful and successful. He was not called by plaintiff as a witness for obvious reasons. Because he was present under process as a witness for defendant, cannot be considered as bearing upon his credibility; nor the fact that he received payment for services rendered plaintiff from the money paid to her by defendant upon the settlement. The record shows that plaintiff had confidence in him, and there is nothing in it to indicate that his testimony as to what he did at her direction is not in perfect accord with the facts. To show that plaintiff was incompetent to make this settlement at the time, reliance is placed upon the testimony of two witnesses who called upon her frequently at the hospital about the time it occurred. The testimony of both ladies tends to show that at the times they saw her she was very nervous and perhaps hysterical; that she seemed somewhat confused mentally, sometimes mistak-

ing one of them for another person. These witnesses did not call at the same time, nor does the record show that either had knowledge that the other was coming to see plaintiff. This testimony shows that one of these witnesses did not call to see plaintiff for a period of at least two weeks, and during this time a settlement was made. Plaintiff told her this and the amount she had received. The other witness states she averaged once a week calling at the hospital, and sometimes might not have gone for two weeks; that on one occasion, in November or December, when plaintiff did not know her, and was in a stupid condition, and moaning, witness could not find out from those present what was the trouble. She saw a pad there, and said, " That girl wants to write." Her testimony proceeds:

" It said on the pad, why she couldn't even speak, and there was something terrible had happened to her, and I couldn't tell what it was. I had made several visits before that. It was the time she signed the papers, because they saw on this paper, ' I signed; they made me sign,' or something like that. I wish I could have kept the paper but it affected me so I could not tell anything about it. She could not speak to me. She wrote on the pad."

In view of the incoherency of this testimony and of the fact that this witness did not know what caused plaintiff's condition and knew nothing of any papers she had signed, except from this writing on the pad, this testimony does not carry the weight it otherwise might.

What was done with the money paid to plaintiff on this settlement and her treatment of the account during the four following years has already been stated. There is no claim made on her part that after she was discharged from the hospital she was not *compos mentis*. The letter which she received from Mr. Hutchins in answer to her demand for payment of about two weeks' hospital charges was notice that defendant held her receipt in full for all claims arising out of her accident, including hospital bills, and that she had been fully compensated. She pre-

served the letter and produced it on this trial four years later. During that interval she used this money as she needed it by drawing it from the bank where her physician had deposited it at her request on the day it was received. There was no repudiation by plaintiff of this settlement until suit was brought, and then or since she has made no tender of the money paid to her. There is no proof or intimation in this record that any fraud or misrepresentation was practiced upon, or made to, plaintiff by or on the part of defendant to bring about the settlement.

We need not rest the case upon the question of fact as to plaintiff's mental condition at the time she executed a full release and was paid the amount agreed upon. Her subsequent acts after she, by her own admission, became *compos mentis* as shown by the record to be undisputed, operated as a ratification and affirmance. It appears that she had knowledge that a settlement had been made, and continued to use the proceeds until the time of the trial. As already stated, there was no repudiation nor tender back of the money, nor was there any excuse offered why this was not done. *Gibson* v. *Railroad Co.*, 164 Pa. 142, 151, *et seq.* (30 Atl. 308, 44 Am. St. Rep. 586), and cases cited. *Drohan* v. *Railway Co.*, 162 Mass. 435, 437 (38 N. E. 1116).

Our conclusion is that the trial court was not in error in entering a judgment for defendant *non obstante veredicto*, for the reason that it was against the weight of the evidence, and for the further reason the settlement was accepted and fully ratified by the plaintiff. The judgment is affirmed.

MONTGOMERY, C. J., and OSTRANDER, HOOKER, and MOORE, JJ., concurred.